You may proceed. And please, the Court, I'd like to start with one issue that everyone seems to agree on. And that is that the common interest privilege afforded by Civil Code Section 47C only applies if publication of the defamatory statement is reasonably calculated to further the common interest shared by the statement's maker and the statement's recipients. In this case, Margaret Roman's only explanation for why her statements about the plaintiff's financial condition were reasonably calculated to spur the managers to a sense of urgency was that it was, quote, where my head was at. There's no other explanation given by her. There's no other explanation on appeal by the defendants as to why those two issues were related. Well, there was some talk about urgency that conveyed a sense of urgency or something like that. Where does that come from? Well, that's her explanation. But in terms of why saying that the plaintiffs were having financial difficulties would cause anybody to move more frequently or more quickly, there's no explanation for that. And no reason why that would have any bearing on their decision. The e-mails that were sent out said that the plaintiffs who had been providing payroll services for these employees, as of four days before the e-mails, were no longer going to be doing that. There was no reason why the reason why they weren't going to be doing that would have any bearing on the managers' activities. Ms. Roman acknowledged that normally the managers would have no reason to know why something was happening, why the employees were being transitioned. And she doesn't explain why in this case it would have any bearing on their decision. Do you agree that the statements made were not immaterial? No, Your Honor. I believe that they were immaterial. You believe they were immaterial. And why is that? Because, again, the idea is she wants them to move more quickly. But the reason she wants them to move more quickly is that the plaintiffs are no longer going to be paying these employees' salaries. The reason why they're not going to be doing that doesn't factor in at all. It has no bearing on the need for the managers to move more quickly. It seems to me you're quibbling with the methodology. But as I understand it, Ms. Roman knew about the embezzlement problem, that it caused setbacks. She knew that AT&T managers had made previous complaints about the plaintiffs' ability to do work. She had received an email from Shirley Dillia describing financial problems caused by Mr. Metz's medical disabilities. And the fact that Mr. Metz denied the financial problems to her directly doesn't mean that she lacked a good-faith belief that they existed. Does that make sense to you? Well, Your Honor, I think there are a lot of different issues that are brought up by that particular discussion. But in terms of the first one, which is whether I'm quibbling over language, which was what the district court said, it's not a matter of language being used. She could have said you really have to move quickly on this or done something like that. But here we're talking about a whole subject matter that had no bearing on the issue. Well, forgive me. I'm not sure that I understand why you can say that. Here's somebody that's managing a particular area. They have these contract employees. The entity they're dealing with says we're not going to finance this anymore. It's contrary to AT&T's normal pattern, I gather, in terms of when they pay for these things. All of a sudden, he says around the time she was going to take a Christmas vacation, this is your problem, basically. So she needs to make a response, get people's attention. Should you have used that particular terminology? Maybe not. But was there not a good faith belief on her part that there were some financial problems here? There was no good faith belief, Your Honor. And why do you say that in light of what I've just indicated to you from the record? Well, Your Honor, a number of issues. One is that they had talked about some problems that they were having, but Ms. Metz had explained to Ms. Robin that, in fact, there was a minor amount of money. You're assuming, counsel, are you not, that just because he said that to her, that she no longer had a good faith belief? I mean, if you're dealing with a creditor or a debtor, as the case may be, and they say, you know, gee, I lost my job and I've had a medical problem and so on, but the check's in the mail, does that mean that you cannot have a good faith belief that maybe they're having some financial problems? Well, Your Honor, one, we are, of course, here on summary judgment, so it's up to what a reasonable jury would determine. But here we've got a case where my clients, over the two years before then, had put out payrolls in excess of $2 million for these employees. There had never been a bounced paycheck. There had never been any problem with the amount of funds in the paycheck. There had been some logistical difficulties. There had been some other difficulties. They were having some. But the money was there. They had paid everything. They might not have been, again, there was some logistical problem, but everything had been done when there was nothing that involved in any of the issues that had to do with a lack of money. And it's not just, what I was talking about is Ms. Metz had said in terms of the internal embezzlement that that involved a small amount of money. Mr. Metz said, you know, we don't have any financial difficulties. The only problem we're having is that because out of these $2 million in invoices, AT&T has only paid 25 percent of them on time. But, again, counsel, with respect, you're asking the court to take what your client said to Ms. Moran, I think it is, Roman, rather, as being what she had to have in her own perception. As I recall, she said, can't we have a little more time because I'm planning to go on vacation. They said no. When you add what was already cited from the record plus that, isn't it reasonable for her, whether she was right or not, to have had a good faith belief that there might be some financial problems here? Well, I don't, on this record, I believe a jury could go either way in determining whether, in fact, she had that good faith belief in the, in those, in that condition because a jury could decide that, in fact, based on the whole history. But isn't the existence of the privilege itself a legal as opposed to a factual issue? That's what the district court indicated. Well, with the district court, there are some cases that say that in terms of whether there is a privileged occasion, that that's something that the district court can decide. Doesn't this go to the heart of whether this is a privileged occasion? Well, no, Your Honor. It's a privileged occasion and then the privilege can be lost either by abuse or by malice. And that's your burden. That's your burden, right? Right. But both of those are jury issues. And the Lundquist case, the whole Lundquist case, is about whether the jury was properly instructed in terms of the situation. In that case, there was no doubt that the statements were reasonably calculated to further the common interest. It was about surgical intervention in, in racehorses, and that was what the statement was about. So there was no doubt about that. But the question was, did, was the jury instructed properly on the issues of malice in deciding whether, in fact, that the privilege should not apply because of the malice situation. But here, Your Honors, if, if the, if we start back to the whole issue of whether it's reasonably calculated to further the interest, if we're just, if you're saying that it's just the language, then Ms. Roman could come in and say, well, I told them that Jerry Metz had just been convicted of, of child pornography and therefore can no longer provide services to AT&T. I did that because I wanted to get their attention and, and make sure that they move more quickly. But that's, but that would not be tied to anything even remotely in the record, whereas in this case, the record shows that she had numerous indicia of financial problems. I understand your client's position is that they told her that there really weren't any problems, except for what Mrs. Metz said to her about the embezzlement issue. But she had many indications that there might be problems, and then the fact that they were unwilling to cut her some slack over the Christmas vacation seems to me she could have had a reasonable and good faith belief that that was yet another indication that they did have financial problems. But, Your Honor, why would the reason for plaintiffs no longer providing services have any bearing on whether the managers would act more promptly? Out of the four days before they got this e-mail, SDVACCI was no longer payrolling their employees. If they wanted those employees to be paid over Christmas, they had to produce some paperwork. So there's no reason to think that saying that my clients were having financial difficulties would cause them to move any more quickly. There's no indication in the record that, in fact, any of the managers had shown themselves to be lazy or not able to deal with their own employees. And, in fact, there's good reason why we should doubt whether Ms. Roman's explanation makes any sense anyhow, because Mr. Metz had told her on December 5th that he was no longer going to provide these services. These e-mails went out on December 19th and 20th. So in those two weeks, she didn't think there was any sense of urgency. She didn't bother to let anybody know at all. And, in fact, she sent out these e-mails to some managers who had already transitioned employees so that there was no reason to send those to them and think that they had to act more urgently. And, in fact, she admitted she just sent out the same verbiage, and when somebody  And the real issue, the real question or point that brings her state of mind into question is that, in that case, those two people, they had transitioned the employees over a weekend. They found out about the need to do it on a Friday. They were transitioned the next Monday. So there was no need for urgency in that case. So here we have Ms. Roman with all this history and with the only explanation being it's just where my head is at, saying, oh, well, I had to talk about these and to act more urgently. Again, if there's a dispute, I think it's not really a legal issue. It's something that a jury could look at. And on that basis, a jury could say, Ms. Roman, we don't believe any of this. We don't believe this story has any validity at all because there's no reason why these managers would care why these people aren't being paid. They're just not going to be paid at Christmastime, and they've got to act more. You agree that in order to succeed in this action, you have to – your client has the burden to show that there was malice, right? Well, not if – not if the statements were not reasonably calculated to further their interest. In other words – Well, if it's not privileged at all, yeah. Yeah. There has to be a privileged occasion first. Right. And, again, there's some – we don't agree on whether the reasonable calculation, whether that's something that shows that there's a privileged occasion or whether  Let's assume – let's assume arguendo that there is a privileged occasion. Okay. You agree your client has the burden to show malice, right? That's right. That's the one question. And the district judge found that there was no evidence of malice, citing the deposition, I think, of Mr. Metz. What's your argument that, in fact, there was ill will or malice to meet the California standard in this case? Well, the evidence is that same passage from Mr. Metz along with other evidence from Ms. Metz. And what the district court looked at is they asked Mr. Metz, does Marge Robin hate you? And he said, well, hate's a very big word. I don't know that she hates us, but do I think there was animosity, ill will? Well, yes, she said so. But he talked about the Christmas issue, did he not? He talked about that. And she was upset that they were having to do that on short notice. And she indicated that. She wasn't happy about that. There's also the testimony of Ms. Metz that when she had previously complained because this was an ongoing problem. AT&T never paid these things on time. They were trying to work out something all the way through. When Ms. Metz told Ms. Robin, well, maybe we're going to have to be a little more selective in our employees, she said, oh, well, it's going to look real bad if you can't service AT&T, and I'd be sure to spread that information widely if you did that. So there was already a threat. Was that one of the statements that was stricken by the district judge? No, Your Honor, that's not. This is Ms. Robin to Ms. Metz. There's no objection to that whatsoever. So this is what Ms. Robin is threatening to do, and that's exactly what happened here. And not only do we have the information that Mr. Metz said about the interaction that he had with her at the time and his reasons to think that there was animosity toward him, but also the fact that she told Mr. Metz, don't talk to anybody about this. She sent out these e-mails secretly, and then she denied them after the fact, when they did get word about the fact that these statements were being sent out there. Then she denied that, in fact, she had ever sent them. And we also have information just on whether she was her feelings on this, that the reckless disregard is that in the deposition testimony, she's practically bragging about the fact that she didn't give any consideration to whether the managers would think that the plaintiffs were going bankrupt or whether this was going to damage their standing with everybody. She didn't consider it at all. She said she just snapped it off with no thought whatsoever to what damage she was going to cause to them. So that that is a reckless disregard, the type of reckless disregard that shows actual malice going way back to the Davis v. Hearst case in the early 1900s. So we have lots of different factors. And, again, at this point, it would be different if I was in front of you following a jury trial, where the jury had decided that, in fact, there was not sufficient evidence of malice. But in this case, of course, it's a summary judgment, as the trial court, which didn't, and Your Honors, who I believe will, must draw all reasonable inferences in favor of my clients. And a reasonable jury, hearing this evidence, hearing all that was going on between the parties and Ms. Roman's actions during this time, could reasonably conclude that, in fact, she was acting with malice. Either it was with the two prongs, of course, either the hatred or ill will, or the lack of a good-faith belief in the statements. On either one of those issues, as long as a jury could reasonably conclude that, then it should not be a summary judgment issue. And also, of course, there's the just the fact that Ms. Roman really can't come up with any reasonable, any explanation as to why, again, whether she believed it or not, but why financial difficulties or why the reason as to SDVATTs, SDVACCIs' decision not to do this, why that would spur them to action. Also, Your Honors, we have the fact that Ms. Roman admitted that the second half of her statement was false. And the full statement, of course, was that SDVACCI are having financial difficulties and can no longer provide services to AT&T. Ms. Roman admitted that that second part was just false. She was not in the record, counsel. I couldn't find the exact part, but it was in your deposition, Your Honor. She admitted that, in fact the fact is she said it was false. I understand. I'm just asking where it is in the record, if you will, on your rebuttal. I will certainly do that, Your Honor. But the fact is she said in answer to that, yes, they could provide services. They had decided that they no longer were going to because of the problems with the payment. But they absolutely – she knew that they could provide services. So that the second half of her statement was false. And that also – that also – You wanted to save three minutes. Three minutes, okay. Okay. But that would also factor into whether, in fact, the first part was false because, of course, we're talking about large amounts of money. If they were able to, in fact, provide services, then they weren't really having financial problems. If they were able to do the one, then the first part, there's also reason to doubt that. Thank you. Thank you, Mr. Clevin. Mr. Fong. Kevin Fong, Pillsbury Winthrop, representing Applease, AT&T, and Margaret Roman. May it please the Court, let me begin with the issues of ill will and good faith. Here, there are two portions of the record which are significant that I'd like to draw the Court's attention to. First of all, on page 76 of the excerpts of record, Mr. Metz testifies in his deposition that prior to December 5, 2000, there was no animosity. So that conclusively wipes out any allegations that there were any threats or any other signs of animosity prior to December 5, year 2000. After December 5, 2000, plaintiff's case is predicated on the supposed animosity arising from the fact that Ms. Roman would have to work on the transition over Christmas. Well, there was no testimony and no inference that could be drawn of actual ill will, hatred, animosity. At most, she was annoyed, as anyone would be having to face this crisis during the Christmas period. It doesn't measure up to the standards set forth under California law. Under both the Lundquist case that plaintiff's counsel mentioned and also the Biggins case that is cited in the plaintiff's brief, plaintiff has the burden of showing that ill will was the primary motive for the communication. That's in footnote 2 of the Biggins case. There is no such showing here, no facts. All we have is the speculation of the plaintiffs. Second portion of the record that is significant. On page 293 of the excerpts of record, Mr. Metz, or excuse me, Ms. Roman testifies in her deposition testimony that Mr. Metz had told her he couldn't do it anymore. So she never admitted that her statement in the e-mail was false. To the contrary, she said Mr. Metz had told her he couldn't do it anymore. Now, granted that's 293 of the record. Does it say why he couldn't do it anymore? He just says there's nothing wrong with my business except my the time I spend on the AT&T contract. That was also in the deposition testimony, not in that passage, but in a different passage. But in her mind, and that's what counts for purposes of this inquiry, in her mind, she had heard Mr. Metz in his own words say he couldn't do it anymore. So there was at a minimum, at a minimum, there was a good faith belief at the time. Plaintiff's counsel locks this and says all she could say is that was what was in her head at the time. But that's the inquiry. What was in her head at the time? And she was pressed hard, cross-examined in her deposition, and she wasn't shaken. She had the factual basis, and she stuck to it. Plaintiffs have failed to show a good faith belief or the absence of a good faith belief on the part of Ms. Roman. So turning to the question of good faith, which is really the flip side of ill will, in Plaintiff's reply brief, the notion has surfaced of conscious disregard or reckless disregard of the truth or falsity of the statements in Ms. Roman's e-mail. In order to meet this threshold, plaintiffs need to show actual awareness that she was doing something wrong, or I guess, you know, maybe even that she had serious doubts. But there's no showing that at the time she had any serious doubts in what she was saying. The case law, which plaintiffs attempt to borrow from Civil Code 3294, the California Punitive Damage Statute, sets a high burden. There has to be actual awareness that you're doing something wrong in order to show a conscious disregard, and there's no such showing here. Finally, turning to the individual claims, which we haven't dealt with yet in oral argument, and this was the alternative grounds set forth in Chief Judge Walker's order, in the reply brief, plaintiffs point to the Church of Scientology case. And, in fact, it's telling in footnote 6 of the Church of Scientology case, the Ninth Amendment, the restatement rule, the very restatement rule that has been followed in California, there must be an actual showing that the recipient or audience, the person hearing the message, actually understood the defamatory statement as pertaining to the plaintiff. That isn't done here. Again, that's Church of Scientology footnote 6. Plaintiff's own case confirms that California follows the restatement rule. There must be a showing that the defamatory statement was actually understood as referring to the plaintiff. Mr. Fong, in this case, as I recall, Judge Walker excluded testimony with respect to third-party understandings in any event, did he not? Yeah, under the hearsay rule, and that's reviewable only for abuse of discretion, obviously. Is it, from your perspective, is there anything left in the record upon which the plaintiffs could rely to show that the Mets' personally were defamed by the alleged defamatory statement? Once those statements are excluded, there's nothing left. Thank you, Your Honors. Thank you very much. Mr. Cleveland, would you like to use the balance of your time? Yes, I would, Your Honor. I'd like to start with the section that Mr. Fong referred to that's at Extra Record 293 from Ms. Roman's deposition. In that section, the question was, did he, Mr. Mets, ever say that he could no longer provide services to AT&T? The answer was, not those words. He couldn't do it anymore. That's what he said. Is that what you're relying upon, to say that he said that she said that she was wrong? Is that what you're relying upon? No. I'm just clarifying that question. It wasn't something where that was all that was said. If you look back at Extra Record at 287, page 92 of her deposition, question, but it was your understanding that they were able to provide services to AT&T if they chose to do so. Is that right? And the answer, at that point, they were able to, but they chose not to. So she was fully aware that SDVACCI were able to provide services. And you can see, if you go back before that, she didn't want to answer that question, and it was difficult to get a response on that. But she knew they were able to do it. They had chosen not to because AT&T simply continued to breach its contract. It had no interest in paying within the 10 days that it agreed to. I mean, the evidence was that after they entered into the agreement, it turned out that, logistically, AT&T was incapable of paying within 10 days. So they never intended to honor their agreement on that. My clients were just stuck carrying the weight on that. Again, Mr. Fong referred to a factual basis, supposedly, for Ms. Roman's statement. But, again, where my head was at is not a factual basis for why statements about my client's financial condition were reasonably calculated to spur these managers into prompt action, any more than statements about, again, Mr. Metz having some sort of criminal conviction might have gotten their attention, but they weren't reasonably calculated to spur them in any sort of action. And in terms of evidence that she was aware that she was doing something wrong, they included her statements, repeated statements to Mr. Metz that he should not contact any of these people, her sending the e-mails out in secret, and her denying afterwards that, in fact, she had sent out these e-mails that contained the defamatory statements. With that, I'll submit. Thank you very much, Mr. Clevin. Mr. Fong, the case of SDVACCI v. AT&T is submitted. The court will stand and rest in recess for five minutes, and then we will hear the final case of the morning, Gribben v. UPS.
judges: Canby, Thompson, Smith